UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VINCE  SCUDIERO and CHRISTEL THORNTON, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 4:12-CV-1088 |
| RADIO ONE OF TEXAS II, LLC, | § § § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause, grounded in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981, and tried to a jury from November 12-18, 2014, are the following matters:  (1) Plaintiffs Vince Scudiero ("Scudiero") and Christabel Thornton's ("Thornton's") motion to strike untimely affirmative defense (instrument #71); (2) Plaintiffs' motion for new trial (#110); (3) Defendant Radio One of Texas II, LLC's ("Radio One's") motion for entry of take nothing judgment (#113); (4) Scudiero's motion for an award of front pay (#116); (5) Plaintiffs' motion for entry of judgment and application for attorneys' fees (#117); and (6) Radio One's notice of unaccepted offer of judgment under Federal Rule of Civil Procedure 68 (#120).

Because the trial exhibits were returned to the parties after the trial, the Court cites to the same documents that were filed as part of the record in conjunction with various motions.

## I.  Plaintiffs' Motion to Strike Untimely Affirmative Defenses (#71)

Plaintiffs' motion to strike Radio One's affirmative defenses regarding mitigation and interim earnings is MOOT because the Court ruled on it orally before trial and these two defenses were presented at trial and included in the jury charge.

## II.  Jury Verdict

Scudiero, a white male, alleged both racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  Thornton, a black female, asserted a single claim of retaliation under both statutes.

On November 18, 2014 the jury returned its verdict.

To Special Interrogatory No. 1, the jury found that Scudiero did not prove by a preponderance of the evidence that his race was a motivating factor in Radio One's decision to terminate his employment or to reduce his commissions.  In response to Special Interrogatory No. 3, however, the jury found from a preponderance of the evidence that Scudiero would not have been discharged or his commissions reduced but for his complaints to Radio One regarding Radio One's alleged racial discrimination against him.  Nevertheless, in answer to Special Interrogatory No. 4, the jury found that Scudiero was not entitled to any back pay and benefits or commissions (i.e., compensatory damages) from the date of the retaliatory adverse action up to November 18, 2014.  In their answer to Special Interrogatory No. 5, the jury found from a preponderance of the evidence that Scudiero did not fail to mitigate his damages through the exercise of reasonable diligence in seeking, obtaining, and maintaining substantially equivalent employment after his discharge.  To Special Interrogatories Nos. 7 and 8, the jury found from a preponderance of the evidence that Scudiero should be awarded punitive damages in the amount of $185,000.00.

As for Thornton, the jury found from a preponderance of the evidence in response to Special Interrogatory No. 9 that Thornton would not have been discharged or her commissions reduced but for her complaints to Radio One about alleged racial discrimination against Scudiero, but in answer to Special Interrogatory No. 10, the jury found that no amount of money

should be awarded to her to compensate her for back pay and benefits or commissions from the date of the adverse action up to November 18, 2014.  In response to Interrogatories Nos. 11 and 12 the jury found that Thornton should receive $25,000.00 in punitive damages on her retaliation claim.

### III.  Plaintiffs' Motion for New Trial Under Rule 59 (#110)

### A.  Applicable Law

Federal Rule of Civil Procedure 59 provides in relevant part,

**(a) In General.**

> **(1) Grounds for New Trial**.  The court may, on motion, grant a new trial on all or some of the issues–and as to any party--as follows:
> > **(A)**  after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

The standard for a district court to grant a new trial is lower than that for granting judgment as a matter of law:  a court in its discretion may set aside a verdict and grant a new trial if, in its opinion, that verdict is contrary to the clear weight of the evidence or if it will result in a miscarriage of justice, even if there is substantial evidence to support it.  *U.S. for Use and Benefit of Weyerhaeuser Co. v. Bucon*, 430 F.2d 420, 423 (5th Cir. 1970); *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 269 n.2 (5th Cir. 1998); 11 Wright & Miller, *Federal Practice and Procedure* § 2806, at 65-66 (1995).  Furthermore the Court does not have to view the evidence most favorable to the verdict-winner party.  11 Wright & Miller, *Federal Practice and Procedure* § 2806, at 65-66.  Where the court finds that the verdict is against the weight of the evidence, it may weigh the evidence for itself.  *Id*. at p. 67.

Thus the court may grant a new jury trial if the jury returns an inconsistent verdict that cannot be reconciled, if the verdict is against the weight of the evidence, if the damages awarded

are excessive, if the trial was unfair, or if prejudicial error was committed during it. *Whereley v. Schellsmidt*, No. 3:12-CV-0242-D, 2014 WL 1632179, at *1 (N.D. Tex. Apr. 23, 2014), *citing Crossland v. Canteen Corp.*, 711 F.2d 714, 726 (5th Cir. 1982); *Willard v. The John Hayward*, 577 F.2d 1009, 1011 (5th Cir. 1978)("If the jury gives inconsistent answers to special interrogatories, the case must be remanded for a new trial."); and *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). In deciding if the answers are inconsistent, the court asks "'whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted.'" *Id., citing FDIC v. Fid. & Deposit Co. of Md.*, 45 F.3d 969, 977 (5th Cir. 1995). The court should find such inconsistency only if there is no way to reconcile the answers. *Id., citing Willard*, 577 F.2d at 1011; *Ellis v. Weasler Engineering, Inc.*, 258 F.3d 326, 343 (5th Cir. 2001)("'We are required under the Seventh Amendment to make a concerted effort to reconcile apparent inconsistencies in answers to special verdicts if at all possible.'")(*quoting Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)).

The Fifth Circuit, along with some sister Circuits, has held that "a finding of liability but no damages does not necessarily render a verdict fatally inconsistent." *Rogers v. McDorman*, 521 F.3d 381, 396 (5th Cir. 2008)(citing *Dairy Farmers of America, Inc. v. Travelers Ins. Co.*, 391 F.3d 936, 945 (8th Cir. 2004)("[A] jury's finding of liability without a corresponding award of damages does not invalidate the verdict."), and *Zhang v. Am. Gem. Seafoods, Inc.*, 339 F.3d 1020, 1036 (9th Cir. 2003)("[T]he federal rule is that failure to award damages does not in itself render a verdict invalid.")); *see also Wingerter v. Maryland Cas. Co.*, 313 F.2d 754, 756 (5th Cir. 1963).[1]

---

[1] In *Wingerter, id.,* the Fifth Circuit cited *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 484-85 (1933). In *Fairmount Glass*, after the jury awarded only nominal damages of $1.00  to plaintiff, the Seventh Circuit reversed and  remanded for a new trial, and the

**B.  Plaintiffs' Argument**

Plaintiffs contend that the jury's finding that Plaintiffs would not have been discharged or their commissions reduced but for impermissible retaliation and the jury's award of zero dollars for compensatory damages are "fatally inconsistent."  Furthermore, at the very least, the award of zero dollars in damages is contrary to the great weight of evidence.  Thus the Court should set aside the jury's verdict and grant a new trial.

**C.  The Court's Determination**

The verdict indicates that the jury did not find any justification for an award of compensatory damages and intended that the Plaintiffs recover nothing, believing that Radio One's retaliatory action did not cause damage to the Plaintiffs.  There are a number of possible, logical explanations for its finding.  The jury could have found, based on the evidence and the credibility of the witnesses, including the credibility of Plaintiffs, that even though the jury found

---

defendant appealed.  The plaintiff argued before the Supreme Court that if it was entitled to recover at all, it was entitled to recover substantial damages.  Writing for the majority, Justice Brandeis famously opined about the alleged inconsistency,

> To regard the verdict as inconsistent on its face is to assume that the jury found for the plaintiff and failed to perform its task of assessing damages.  The trial court was not obliged so to regard the verdict.  The defendant had insisted upon several defenses and had set up a counterclaim.  The plaintiffs were not entitled to a directed verdict.  The evidence was voluminous; and on some issues at least, conflicting.  The instructions left the contested issues of liability to the jury.  The verdict may have represented a finding for the defendant on those issues; the reason for the award of nominal damages may have been that the jury wished the costs to be taxed against the defendant.  The defendant did not complain of the verdict.  The record before us does not contain any explanation by the trial court of the refusal to grant a new trial, or any interpretation by it of the jury's verdict. In the absence of such expressions by the trial court in the case at bar, the refusal to grant a new trial cannot be held erroneous as a matter of law.  Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct. [citations omitted]

that Radio One retaliated against them, Plaintiffs failed to prove by a preponderance of the evidence that their alleged discharge and/or commission and benefit losses were caused by the alleged discriminatory conduct rather than by other causes about which there was ample evidence, such as poor performance.  Or it could have found that Plaintiffs failed to prove by a preponderance of the evidence any significant adverse impact and consequences caused by Radio One's retaliatory conduct.  It could also have reasonably found from the evidence that Radio One acted intentionally and maliciously or with reckless indifference to Plaintiffs' federally protected rights, warranting the award of punitive damages, but that there was no grounds for a compensatory damages award.  Furthermore, as Radio One points out in its response (#112 at p. 2), the verdict does not reveal whether the jury found Plaintiffs' discharges or reductions in commissions, or both actions, to be retaliatory, or that Plaintiffs' evidence regarding damages was contested and speculative, suggesting a reason why the jury awarded zero compensatory damages.

Thus the Court finds that Plaintiff's motion for new trial is not well taken and denies it.

## IV.  Radio One's Motion for Entry of Judgment (#113)

Radio One moves for entry of a take nothing judgment under Federal Rule of Civil Procedure 58 on the grounds that the evidence was insufficient to support the jury's award of punitive damages to each Plaintiff.

## A.  Applicable Law

Compensatory damages serve to remedy "the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," while punitive damages serve the functions of deterrence and retribution.  *State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 416 (2003), *citing Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424,, 432 (2001), *BMW*

*of North America v. Gore*, 517 U.S. 559, 568 (1996), and *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991).

Proof of punitive damages must meet "a higher standard than the showing necessary for compensatory damages" and is met "in only a subset of cases involving intentional discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534, 535 (1999), *quoted by EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 467 (5th Cir. 2012)(*en banc*), and *Henry v. CorpCar Services Houston, Ltd.*, No. 13-20744, __ Fed. Appx. __, 2015 WL 327650, at *7 (5th Cir. Jan. 27, 2015). Punitive damages may be recovered in an action under Title VII "only if the complaining party demonstrates that the respondent engaged in discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1)[2]; *Henry*, 2015 WL 327650, at *7, *citing Kolstad v. American Dental Assoc.*, 527 U.S. 526, 534 (1999). A defendant acts with malice or reckless indifference to the federally protected rights of a plaintiff if the defendant knew that it may be acting in violation of federal law or if it acted with reckless disregard of that law, but not with awareness that it is engaging in discrimination; a showing of egregious or outrageous conduct is not required. *Kolstad*, 527 U.S. at 535; *id*. While it is not necessary to show malice for an award of punitive damages, at the very least the standard for intent of the employer

---

[2]   Originally Title VII provided only equitable relief and did not permit putative damages. In passing the Civil Rights Act of 1991, it passed § 1981a(b)(1), allowing for compensatory and punitive damages to a "complaining party"; punitive damages are available against a respondent other than a government, government agency of political subdivision. "Punitive Damages in Actions for Violations of Title VII of the Civil Rights Act of 1964," 150 A.L.R. Fed. 601 § 2(a).

In *Smith v. Wade*, 461 U.S. 30, 56 (1983), the Supreme Court employed language similar to that later included in § 1981(a) in stating that "'a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Kolstad*, 527 U.S. at 536.

requires recklessness in its subjective form, i.e., "'a subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Id., citing Smith*, 461 U.S. at 37 n.6 and 41 & n.8.  The terms "malice" and "reckless" relate to the actor's state of mind and "pertain to the employer's knowledge that it may be acting in violation of federal law."  *Kolstad*, 527 U.S. at 535, 536.  "Pointing to evidence of an employer's egregious behavior would provide one means of satisfying the plaintiff's burden to 'demonstrat[e]' that the employer acted with the requisite 'malice or . . . reckless indifference,'" but "an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for punitive damages award."  *Id.* at 539, quoting § 1981a.  Intentional discrimination might not meet this standard if the employer "is unaware of the relevant federal prohibition" or "discriminates with the distinct belief that its discrimination is lawful."  *Id.* at 537.

Even if a plaintiff shows that the employer acted with malice or reckless indifference, the employer can avoid vicarious punitive damages liability if it demonstrates that it made a good faith effort to comply with Title VII.  *Id.* at 545-46; *EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 467 (5th Cir. 2012)("Given these stringent standards, a plaintiff faces what our sister circuit has called a 'formidable burden' in seeking punitive damages for employment discrimination.")(*citing Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 903 (8th Cir. 2006)).  Moreover to impute liability to his employer from acts of his supervisor, a plaintiff must demonstrate that the "malfeasing agent [of the employer] served in a 'managerial capacity' and committed the wrong while 'acting in the scope of employment.'"  *Rubinstein v. Adm'r of the Tulane Educ. Fund*, 218 F.3d 392, 405 (5th Cir. 2000), *citing Kolstad*, 527 U.S. at 545.  Where the employer has shown that it acted in good faith, the employer "may not be vicariously liable for the discriminatory employment decision of managerial agents where these

decisions are contrary to the employer's good-faith efforts to comply with Title VII."  *Id., citing id.* at 545.

Sometimes the existence of a written policy instituted in good faith has operated as a total bar to employer liability for punitive damages.  *Kolstad*, 527 U.S. at 544, *citing  Harris v. L&L Wings, Inc.*, 131 F.3d 978, 983 (4th Cir. 1997)(and cases cited therein); *see also EEOC v. Boh Bros. Const. Co., LLC*, 731 F.3d 444, 467 n.30 (5th Cir. 2012)(same).  The Supreme Court in *Kohlstad*, *id.* at 545, emphasized,

> Dissuading employers from implementing programs or policies to prevent discrimination in the workplace is directly contrary to the purposes underlying Title VII.  The statute's "primary objective" is a prophylactic one," *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 417 . . . (1975); it aims, chiefly, "not to provide redress but to avoid harm," *[Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998)]. . . . The purposes underlying Title VII are similarly advanced where employers are encouraged to adopt antidiscrimination policies and to educate their personnel on Title VII's prohibitions.

The Fifth Circuit has held that a punitive damages award under Title VII and § 1981 does not have to be accompanied by a compensatory damages award.  *Abner v. Kansas City Southern R. Co.*, 513 F.3d 154, 160, 163 (5th Cir. 2008)(awarding punitive damages in the amount of $125,000 for each plaintiff where no compensatory damages were awarded in a Title VII suit and reasoning that "preventing juries from awarding punitive damages when an employer engaged in reprehensible discrimination without inflicting easily quantifiable physical and monetary harm would quell the deterrence that Congress intended in the most egregious discrimination cases under Title VII."); *E.E.O.C. v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 734 (5th Cir. 2007)(holding that punitive damages may be awarded absent compensatory damages under 42 U.S.C. § 1981).  *In accord, Hertzberg v. SRAM Corp.*, 261 F.3d 651 (7th Cir. 2001).

In *Abner*, the Fifth Circuit affirmed the trial court in a Title VII case regarding punitive damage awards up to the statutory cap of $125,000 per plaintiff even when no other (including

compensatory) damages were awarded by a jury. *Abner*, 513 F.3d at 163 (holding that "preventing juries from awarding punitive damages when an employer engaged in reprehensible discrimination without inflicting easily quantifiable physical and monetary harm would quell the deterrence that Congress intended in the most egregious discrimination cases under Title VII."). *In accord, Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001)(punitive damages may be awarded in a Title VII case without an award of nominal or compensatory damages; "In Title VII cases, however, the statutory maxima capping punitive damages awards strongly undermine the concerns that underlie the reluctance to award punitive damages without proof of actual harm. . . . 42 U.S.C. § 1981a(b)(3) provides that punitive damages cannot exceed $50,000, $100,000, $200,000, or $300,000, depending on the size of the defendant company."); *Alexander v. Riga*, 208 F.3d 419, 429 (3d Cir. 2000)("[P]unitive damages can be awarded in a civil rights case where a jury finds a constitutional violation, even where the jury has not awarded compensatory or nominal damages."), *citing Curtis v. Loether*, 415 U.S. 189 (1974).

**B.  Radio One's Rule 59 Motion**

Radio One argues that there was insufficient evidence to support the jury's award of punitive damages to both Plaintiffs.  Proof is not adequate to support an award of punitive damages for a retaliation claim where, as here, there is evidence that Plaintiffs' supervisors believed that Plaintiffs' performance was deficient.  *Smith v. Xerox Corp.*, 602 F.3d 320, 334-35 (5th Cir. 2010)(mixed motive case), *abrogated on other grounds, University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013)(holding that Title VII retaliation claims must be proved according to but-for causation, i.e., that the retaliation would not have occurred in the absence of the alleged wrongful action of the employer, and not the "motivating factor" causation test for mixed-motive cases because 42 U.S.C. § 2000e-2(m) applies only to

discrimination claims, but not to retaliation claims).

Radio One analogizes this case to that in *Smith*, in which the Fifth Circuit vacated the jury's award of punitive damages because the plaintiff failed to provide sufficient evidence to satisfy the malice or reckless indifference standards.  The Fifth Circuit wrote in *Smith*, 602 F. 3d at 336,

> [T]here is no "useful litmus for marking the point at which proof of violation sufficient to impose liability becomes sufficient to also support a finding of malice or reckless indifference."  But based on our review of the evidence, we are not convinced that such a threshold has been met in this case.  Smith's arguments in support of punitive damages focus on the alleged egregiousness of Xerox's conduct rather than the subjective state of mind of its managers.  Although egregious or outrageous conduct can support an inference of "evil motive," that showing is not present here.  For example, despite Smith's focus on the disciplinary policies and procedures, Smith was placed in the [employer's] disciplinary process long before she filed her EEOC complaint.  Smith may have disagreed with the allegations of the letters placing her on the 90- and 60-day warning and probation periods, but the letters described in detail management's perceived deficiencies in Smith's performance and Smith's need to meet her sales goals.  It is undisputed that Smith did not do so, or that the letter placing her on probation warned that she could be terminated.  There was also evidence, although contested by Smith, of contemporaneous complaints by Xerox agents about Smith's product knowledge and level of support.
>
> In light of the competing evidence that impugned Smith's performance, we cannot say that the evidence supports a finding that Xerox managers acted with malice or reckless indifference to the possibility that her termination could violate federal law.  We therefore hold that, although the evidence was sufficient to find that retaliation was a motivating factor in the termination, the punitive damages award based on malice or reckless indifference to federal rights cannot stand.  That portion of the district court's judgment must be vacated.

Radio One emphasizes that Plaintiffs in the instant case were also placed in Radio One's disciplinary process long before they engaged in any allegedly protected activity.  Both were repeatedly counseled about their performance, both before and after they made any complaints that Radio One was racially discriminating against Scudiero.  Radio One introduced documents at trial describing in detail management's complaints about their performance.  There was also evidence of contemporaneous complaints by Radio One's agents, although contested by

Plaintiffs.  As in *Smith*, Radio One contends that given this evidence, the court should not find that Radio One's managers acted with malice or reckless indifference to the possibility that their terminations could violate federal law.  Radio One points out that Plaintiffs' attorney did not mention punitive damages, no less request them, in his closing argument.  Therefore the Court should enter a take nothing final judgment.

## C.  Plaintiffs' Response (#115)

In response to Radio One's challenge to the jury verdict, the court "must draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable.  [I]t is the function of the jury as the traditional finder of the facts, and not for the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."  *Rhines v. Salinas Const. Technologies, Ltd.*, 574 Fed. Appx. 362, 364 (5th Cir. June 25, 2014), *citing Boh Bros.,* 731 F.3d at 452, and *Roman v. W. Mfg., Inc.*, 691 F.3 686, 692 (5th Cir. 2012)(*quoting Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997).

Thornton asserts that Clary made racially discriminatory remarks to her in the workplace that caused her to believe that Clary was racially discriminating against Scudiero.  He purportedly said with regard to Methodist Hospital, "[T]hose white people aren't gonna buy us." Referring to a client of Thornton's who was also her aunt, he allegedly asked, "Why would your Auntie do a Brotha like that?" and warned that Thornton needed to "check . . . that white boy."

Plaintiffs insist that there is ample evidence to support the jury's reasonable inference that Radio One acted with malice and in reckless disregard for Plaintiffs' federally protected rights.  They summarize their argument as follows (#115 at pp. 7-8, omitting paragraph numbers):

To sum up briefly, Radio One's management team and corporate human resource department were aware that Scudiero and Thornton believed that Clary, a member of Radio One's management team, was discriminating against Scudiero because of his race.  They also knew that when Clary became aware of the Plaintiffs' reported concerns, he began to interfere with their accounts and commissions.

In response to the Plaintiffs' reports of retaliation by Clary, a cursory "investigation" was performed which failed to include Scudiero or Abernethy or any relevant information from Thornton. Not surprisingly, the results of the "investigation" identified Scudiero and Thornton as "pot stirrers" giving tacit approval to Clary's retaliatory conduct.

Following the investigation, Clary immediately placed Scudiero and Thornton on performance improvement plans. A few days later, Abernethy recommended Scudiero's termination and began interviewing for Scudiero's replacement. Simply put, Radio One never intended to allow Scudiero to complete the PIP.

Similarly, Thornton was going to be terminated for one reason or another. First, she was placed on a PIP. Then, she was suspended for printing a master account list. Finally, while on suspension, Thornton was terminated based on another "investigation" conducted by someone from Radio One's corporate office entirely in her absence.

In other words, the evidence makes clear that Radio One's management team and corporate human resources department knew that Clary was targeting Scudiero and Thornton after they complained that Clary was violating Scudiero's federally protected rights. Rather than take meaningful action to correct the situation, Radio One labeled the Plaintiffs as the source of the problem paving the way for their terminations.

Radio One's perceived risk that its actions were in violation of federal law is further demonstrated by the ruse of placing Scudiero on a PIP without any intention of retaining Scudiero as an employee. Similarly, the evolving justification for Thornton's termination, including the involvement of a Radio One corporate officer, provides additional support for the inference that Radio One was aware of, but disregarded, Thornton's federally protected rights.

Perhaps most telling is Radio One's response to the EEOC's finding of discrimination and retaliation. Specifically, Radio One's management team was not made aware of the finding, let alone, required to address it. Radio One's complete disregard for the EEOC's finding is significant evidence of its attitude towards the Plaintiffs' federally protected rights.

EEOC findings of fact and determinations are not binding on the trier of fact, even though they are admissible as evidence in  civil proceedings.  *McClure v. Mexia Indep. Sch.*

*Dist.*, 750 F.2d 396, 400 (5th Cir. 1985); *Massingill v. Nicholson*, 496 F.3d 382, 384-85 (5th Cir. 2007).  *See also Smith v. Universal Services, Inc.*, 454 F.2d 154, 157 (5th Cir. 1971)(Title VII civil litigation "at the district level clearly takes on the character of a trial de novo, completely separate from the actions of the EEOC" and the EEOC's report "is in no sense binding on the district court and is to be given no more weight than any other testimony given at trial."); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 201-02 (5th Cir. 1992)(the district court has the discretion to completely exclude an EEOC report if it finds that prejudice or other considerations enumerated in Federal Rule of Evidence 403 outweigh its probative value).

**D.  Court's Ruling**

First, with regard to both Plaintiffs, as noted *supra*, the existence of a written policy instituted in good faith has at times operated as a total bar to employer liability for punitive damages.  *Kolstad*, 527 U.S. at 544.  Certainly then the existence of such a policy is a factor to be considered in the employer's favor.  Radio One had such a policy clearly prohibiting *inter alia* discrimination based on race as well as Title VII's other protected classes and stating, "No retaliation will be taken by the Company or permitted against anyone making [such] a claim or cooperating in the investigation of any such claim."  #35-4 (Ex. D).  Moreover that policy set out the complaint procedure, *id.*:

> The Company requires the reporting of all incidents of discrimination or harassment regardless of who the offender may be in order to take advantage of the procedures outlined herein.  Individuals who believe that they have been subjected to discrimination or harassment should report the matter to the Department of Human Resources.  The Department of Human Resources will then determine and may direct such investigation as the Company deems appropriate under the circumstances.

In addition, under the section entitled "Employee Complaint Procedure," the policy provides regarding any differences of opinion that arise between individuals employees at Radio One, *Id.*,

Employees who submit a complaint or grievance under this procedure should not be harassed nor should any reprisals be taken against employees who file complaints in accordance with this procedure.  Employees are not to disrupt or in any manner interfere with the work of any other employee.

Any employee having a grievance or complaint relating to his/her status or conditions of employment with the Company should first discuss the problem with the employee's immediate supervisor.  (If the employee believes discussion with his/her supervisor would be problematic due to the supervisor's role in the subject of the complaint, any other member of senior management can be contacted to discuss the problem in confidence.)

If the employee feels that no satisfactory conclusion has been offered, the employee may request an appointment or write to the Department of Human Resources giving the employee's reasons for disagreement.  In the event the Department of Human Resources concludes that a meeting is to be held, the employee and others concerned may be asked to attend to discuss the employee's complaint in order to make a fair and final determination of the complaint.

If the employee still finds the result unsatisfactory, the ultimate determination is to be made through arbitration. *Id.*

In both Plaintiffs' cases the chronology of events is significant.

The Court addresses Thornton's punitive damages award first.  Plaintiffs have failed to show that Radio One's Human Resources Department and those managers responsible for firing Thornton had any knowledge of any complaints of racial discrimination against Scudiero by Thornton, while Radio One has produced substantial evidence that they did not.  Not only to show malice or reckless indifference, but "to establish the causation prong of a retaliation claim, the employee should demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).  When asked if Thornton had ever actually told someone at Radio One or her direct supervisor, General Sales Manager for Radio One's Station KROI-FM Joel Clary,[3] himself, that she thought Clary was racially discriminating against anyone at Radio One, Thornton conceded in her deposition that

---

[3] Clary was also the person who hired Thornton at Radio One.  Thornton Dep., #36-1, p. 118, ll. 20-21.

> I don't necessarily think I used the words "discriminating" other than--I may or may not have.  I don't recall. . . . . That's correct and accurate in saying I did not say, Joel, you're discriminating against so and so.   What I did say is, That's uncomfortable for me; it has no bearing on what we're attempting to do here.  Those were the words and terms that I would use.  But I don't recall saying, you discriminated against . . . .

#37-2 (Thornton's Dep.) at p. 86, ll. 22-24, p. 87, ll.14-19.  She also claimed that she called the company's hotline to complain about him, but admitted that it was an anonymous complaint.  *Id.*, p. 87, ll 20-22.

While she complained to and about Clary generally, she never told anyone in clear terms that she believed he discriminated against her or anyone else, nor offered any proof of such, but simply asserted her subjective, conclusory opinion.  When asked, "But you don't have any independent recollection of having told someone from HR about Joel having discriminated against somebody or--or made any kind of racial slurs or anything like that?," she responded, "I don't recall using the term 'discrimination.'"  *Id.*, p. 112, ll. 16-20.  While she acknowledged that she did not "know if [Clary] was necessarily retaliating on me or not" and did not "know what his motives are," [#36-1 at p. 88, ll. 1-2. 26], she stated that she thought her performance review in 2008 by Clary was "partially" retaliatory [*id.*, at p. 89, ll. 1-4] (Thornton's Application for Employment).   Clary had written that she "needs improvement" in communications.  Thornton admitted that although she wrote a comment in the space for the employee's responsive comment on that document, she did not write anything about Clary's discriminating against any one or about Clary's purported retaliation against her.  *Id.* at p. 99, ll. 10-16 and Ex. 1.

Thornton also states that in a conference call with Gloria Celestin in Human Resources on November 12, 2008, she discussed issues that she was having with Clary, but admits that she did not say anything about Clary's alleged racial statements.  *Id.* at p. 104, ll. 3-24.  Thornton had another conversation with Celestin in April 2009, in which Jackie Thornton, another Human

Resources employee, joined.  While notes from the Human Resources personnel indicated that Christel Thornton "says morale has gotten better," at her deposition Thornton could not remember the conversation, but again stated, "I don't recall using the term 'discrimination.'"  *Id.* at p. 108, l.21-25; p. 112, l. 20; also Ex. 9 (HR Notes).

Thornton now complains that Clary unfairly treated her client/aunt by disrespectfully referring to her as "my Auntie Joan," which she subjectively found to be racially discriminatory *Id.* at p. 122, ll. 1-8.  When asked what was retaliatory about Clary's refusal to let her do political ad buys in October 2008, she responded, "[E]verything.  The fact that Joel was unhappy with things that I was saying to him, he was mistreating me--he was treating me differently than other reps, as well as taking away revenues that I went out to help--to assist in generating for the company," but she conceded on further questioning that she could not recall if he actually took away any revenue or her commission.  Id. at p. 122, l.15-p. 123, l.8.  Thornton also fails to show how her objections to his comments that she perceives as racially discriminatory caused his refusal to let her sell political ads.  Id., p.123, ll. 18-24.

On November 10, 2008, Thornton received her annual performance review (dated 11/6/08) from Clary, who found that she needed improvement in six of eleven categories, including "Self Management and Initiative," "Communications," "Interpersonal Skills, Teamwork and Collaboration," "Quality of Work, Technical Ability and Adherence to standards,"); she received an overall performance rating of "Needs Improvement."  #36, Ex. A(Thornton Dep.), Ex. 8.  On June 5, 2009 Clary placed her on a 60-day Performance Improvement Plan ("PIP") because of ongoing deficiencies in her performance and listed specific tasks that she must perform right away.  #36, Ex. A, Ex. 11.  The PIP warned her that "If significant improvement is not shown within the next (*60*) days, further disciplinary action up to,

and including, termination of your employment with the company will result.  However, if little or no progress is being made or other unacceptable behavior occurs, you may be terminated at any time prior to the end of (*60*) days." *Id.*

On August 6, 2009 Doug Abernethy, Radio One's Regional Vice President, suspended Thornton without pay after learning that she had printed out the company's master customer account list and removed it from the company's grounds without authorization, as well as giving Scudiero, shortly after his discharge, access to the employee parking garage.  #37, Ex. B (Thornton Dep.), Ex. B. at pp. 142-49; #36-4 (Thornton Dep.) at p. 109, l. 23-p. 109, l. 9. Thornton conceded that she had done so, but claimed that she needed the list of accounts for work in the field and did not know it was confidential (#37-2, at pp. 142-74).  In Radio One's Policies, specifically in the one entitled "Employee Conduct and Work Rules" and under "Violations for Which You May Be Discharged," are found "Stealing or removing without permission Company property or property of another employee, customer, or visitor" and "Failure to follow Company procedures for maintaining the confidentiality of the Company's proprietary information."[4]

Subsequently, while Thornton was under performance review, Radio One discovered that Thornton was sending out unauthorized,  false invoices to obtain higher commissions than she was entitled to, estimated by Abernathy to total over $12,000.  #36-4, Ex. D (Abernethy Deposition) at p. 105, ll. 12-24,; p. 107, ll. 4-19; p. 108, ll. 10-12, 20-23.  Abernethy informed Human Resources and Finance and they conducted an extensive investigation.  In the aftermath

---

[4] The Policy also lists as a violation for which an employee could be discharged, "Obtaining your job by lying or giving false information."   Thornton admitted during her deposition that she "inaccurately" represented on her employment application for Radio One that she graduated from high school; she refused to say the entry was "not true" or was "false."  #36-1 at pp. 39-49.  This "inaccurate" information on her application, however, was not cited by Radio One as the cause for her termination.

of the printing out and removal of the master list from Radio One premises, her continuing performance deficiencies, and the fraudulent invoicing (*id.* at p. 108, l. 2-p. 110, l. 12), Thornton was terminated on August 13, 2009 by Abernathy pursuant to  recommendations of discharge from Deborah Cowan, Senior Vice President of Finance (#36-5, report on her investigation of the invoice issue), and from  Human Resources (*id.* at p. 109 l. 23-p. 110, l.6).  Plaintiffs produced no evidence showing that either Cowan or Human Resources had knowledge of any protected activity under Title VII of complaints made by Thornton that Clary was racially discriminating against Scudiero or retaliating against her.  Thus any alleged protected activity by Thornton could not have been the "but for" cause of her termination by Radio One.  Nor did Plaintiffs produce any competent evidence to rebut the reasons for Thornton's termination.

In addition, the evidence shows that Clary was not authorized to, and did not make the decision to, terminate Thornton.  During his deposition Clary testified that he never recommended and had no part in the decision to discharge Thornton.  #36-3, Ex. C (Clary Dep.) at p. 91, ll. 11-22.  Furthermore, the following colloquy took place during Thornton's deposition, #36-1 at p. 177, l. 4-p. 174, l. 17:

Q.  Do you have any information that Joel was in any way a decision maker with respect to your discharge?

A.  Well, he was my manager.

Q.  That's not my question.  My question is:  Do you have any information that Joel was involved in the process of deciding whether or not you should be discharged?

A.  Well, since I wasn't part of those or privy to any of those meetings, I don't have factual information.  But given that he was my sales manager, I'm sure that he played a role in my termination.

Q.  So, in other words, you don't know one way or another?

A.  I don't know for a fact, no, sir.

Q.  Okay.  And you don't have any information that he was consulted, made any decisions or was even asked about whether or not you should be discharged or not, right, ma'am?

A.  That's correct, I don't.

Q.  Okay.  What about with respect to the company's decision to enforce the non-compete agreement[5] against you?  Do you have any knowledge that Mr. Clary had any involvement in that at all?

A.  No, I don't know that as a fact.

Q.  What about the suspension when you were actually talked to about these issues--of meeting Mr. Scudiero in the parking garage and the account list and, you know, that sort of thing.  Do you have any information that Joel was consulted about whether or not to suspend you?

A.  No, I don't know that as a fact either.

Thornton stated during her deposition that the only two people at Radio One who retaliated against her were Clary and Doug Abernethy, that "I don't personally believe Doug was retaliating against me was much as it was having Joe's back." #36-1 at p. 172, l. 16-p. 173, l.1.

Thornton did not file a charge of retaliation with the Texas Workforce Commission against Clary, asserting that her complaints that Clary allegedly racially discriminated against Scudiero, until October 7, 2009, almost two months after her discharge, so it was clearly not the cause of her termination (#36-1, Ex. 7 and its Ex. A).[6]

---

[5] When Thornton was hired she signed a noncompetition agreement that she would not work as an account executive for any competing radio station in the Houston, Texas radio market for three months following her separation from Radio One.  #36, Ex. A, Thornton Dep at 162:7-10, and Dep. Ex. 15.

[6] In that charge Thornton alleged the following were acts of retaliation against her by Clary:

Clary began to retaliate against me by treating me disrespectfully in the workplace, including screaming and cursing at me publicly in front of my co-workers, making disparaging remarks about me to my co-workers, and commenting about the fact that I was "dating a white boy."

In sum, Plaintiffs failed to show that Radio One acted with malice or reckless indifference to Thornton's federal protected rights.  Instead the evidence shows that when Radio One discharged her, the persons involved in the decision to terminate her did not know about her allegations of racial discrimination and retaliation claims and therefore could not have fired her

---

In addition, Clary (i) attempted to remove me from a  new business account that I brought to Radio One; (ii) refused to allow me to sell political ads prior to the election in November 2008, while allowing other co-workers to do so; (iii) wrote me up for "bucking the system" when I did sell a political ad; (iv) refused to approve advertising that I sold for the station to which I was assigned (Praise, KROI, 92.1 FM) as "cross-sales," to Radio One's other two Houston stations (Majic and the Boxx) despite approving such sales prior to my objecting to his racially motivated conduct; and (v) gave me a negative performance review.

A plaintiff alleging retaliation under Title VII must prove that she engaged in an activity protected by Title VII, that an adverse employment action (i.e., one that might well dissuade a reasonable worker from making or supporting a charge of discrimination) occurred, and that there was a causal link between her protected activity and the adverse action.  *Ackel v. National Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003); *Puente v. Ridge*, 324 Fed. Appx. 423, 429 (5th Cir. 2009).  None of these acts by Clary of which Thornton complained would have alerted Radio One that Clary was retaliating against Thornton in violation of Title VII and § 1981 because as a matter of law they did not qualify as materially adverse actions. "Petty slights or minor annoyances that often take place at work and that all employees experience" are not adverse employment actions under the statute.  *Burlington & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006).  Counseling an employee to improve her performance, reminding her of the consequences of poor performance, and work-related reprimands do not satisfy the standard for retaliation.  *Brown v. Liberty Mutual Group, Inc.*, __ Fed. Appx. __, 2015 WL 16091441, at *3 (5th Cir. Apr. 10, 2015); *Thompson v. Exxon Mobil Corp.*, 344 F. Supp. 2d 971, 981 (E.D. Tex. 2004) (documented reprimands that might affect an employee's future employment decisions, disciplinary writeups, and negative performance evaluation, even if undeserved, do not qualify as adverse employment actions); *Arensdorf v. Snow*, 259 Fed. Appx. 639, 642-43 (5th Cir. 2007) (screaming at employee, negative job review, "unacceptable rating on her annual review, and placement on a PIP did not constitute adverse employment actions).  An employer's action taking away a major account is not an adverse employment decision.  *Walker v. Thompson*, 214 F.3d 615, 629 (5th Cir. 2000), *overruled on other grounds*, *Burlington Northern*, 548 U.S. at 214 (broadening the definition of adverse employment action for retaliation claims from "ultimate employment decisions" to actions that might dissuade a reasonable employee from making or supporting a charge of discrimination).  Nor does a written disciplinary warning for insubordination and being argumentative qualify where "there were colorable grounds for the warning and a reasonable employee would have understood a warning under these circumstances are not necessarily indicative of a retaliatory mind-set."  *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 442 (5th Cir. 2007).

with malice or reckless indifference regarding her federal rights under Title VII and § 1981.

Regarding Scudiero, Radio One correctly points out that in his deposition Scudiero conceded that the first time he publicly complained to Abernethy and anyone in Human Resources that Clary was allegedly discriminating against him based on his race was on March 25, 2009.[7]  #35, Ex. A at p. 84, l. 25-p. 84, l. 13.  This was Scudiero's first "protected activity."  Therefore anything that happened before that day could not support a retaliation claim.   The evidence shows that the decision to terminate Scudiero took place long before he filed his EEOC charge and before he was terminated.

Thus the following actions do not support his retaliation claim.   Scudiero received a negative annual Performance Appraisal evaluation, dated 11/12/08, rating him overall as "Needs Improvement."  #35-10, Ex. J.  Plaintiff submitted a response, which caused Clary to revise the appraisal to "satisfactory."   *Id.*, Ex. A at 111, ll. 15-19.   Scudiero again objected to his evaluation, Ex. A at p. 111-20-23 and Ex. K.  Because Clary found that Scudiero's deficiencies persisted, Clary had a one-on-one meeting with Scudiero on March 18, 2009 and gave Scudiero a final warning, complaining of Scudiero's persistent "total lack of preparedness" in failing to show evidence of his work in the Efficio computer software program or in presentations and of his reliance solely on agency accounts and admonishing that in this final warning "it will not be tolerated in the future" and "[f]ailure to comply will result in further corrective measures."  #335-12, Ex. L. See also Scudiero Dep., Ex. A at p. 129, ll. 3-15.   Thus one week before he allegedly voiced his racial discrimination complaint, Scudiero had been given a final warning to improve his work performance.

---

[7] As was the case with Thornton, the acts he complains of were not materially adverse actions and therefore would not support a retaliation claim.  See footnote 6 of this Opinion and Order.

On June 3, 2009 Clary issued Scudiero a 60-day PIP stating that Human Resources and Clary had reviewed his performance to "define for [Scudiero] the seriousness of the situation so that [Scudiero] may take immediate corrective action" regarding his "ongoing deficiencies in documentation of account management and solicitation of business."  #35-15, Ex. O, which Scudiero signed on June 4, 2009.  It detailed again what he was expected to do and warned him that if he did not improve, disciplinary measures up to termination would result, and "if little or no progress is being made or other unacceptable behavior occurs, you may be terminated at any time prior to the end of (*60*) days."  *Id*.

When Scudiero met with Clary on June 3, 2009 to discuss Scudiero's PIP, Scudiero secretly recorded the conversation in violation of Company policy.  #35-16, Ex. P; Ex. A, Scudiero Dep. at p. 139, l. 18-p. 40, l. 21.  Moreover, after that meeting Scudiero continued missing important meetings and making excuses.  Ex. A, p. 168, l. 23-169; p. 165, l. 18-p. 166, l. 10; Ex. R.

Clary did not know their discussion in that meeting was being recorded, but the recording shows that Clary made clear that the meeting was not because Scudiero made a complaint about him, but the purpose of the meeting was about Scudiero's poor performance.  When Scudiero continued to miss important meetings, Abernethy decided to terminate Plaintiff and informed Jackie Kindall, Vice President of Human Resources, in an email dated June 15, 2009.  Ex. W.

 On June 16, 2009 an email reflected that Scudiero failed to return phone calls from a potential client who had left several messages.  #35-19, Ex. S. On June 17, 2009 Scudiero met with Kindall in her Maryland office.  Ex. A at p. 203, ll. 16-22.  Scudiero tried to convince Kindall that it was Clary who should be fired, but Kindall told Scudiero that he needed to focus on his PIP.  Ex. A at p. 201, ll. 8-16.

On June 18, 2009 Scudiero sent Kindall and Abernathy the secret recording he made of the June 3, 2009 meeting with Clary.   Kindall called Scudiero on June 19, 2009 and memorialized the conversation in a memorandum titled "Recap of our conversation," #35-31, Ex. EE.  She stated that there was an obvious conflict between him and Clary and that she was recommending that Bob Mackay sit in on any future performance meetings and one-on-one meetings he had with Clary.

On June 23, 2009 Scudiero told Clary that he, Scudiero, had "an ace in the hole" (the recording) and that Clary would soon be fired.  #35-24, Ex. X, June 23 office memo and email made by Clary documenting the event and Scudiero's subsequent denial that it happened.   On June 29, 2009 and July 1, 2009 Scudiero sent emails stating that he was not coming to work because of chest pain from "all the stress I'm dealing with at work."  #35-20, Ex. T.

On July 8, 2009 Abernethy and Barbara Wilson decided to terminate him and told him on July 21, 2009.  #35-23, Ex. W; Ex. a at p. 198, l. 22-p. 199, l. 5.

When an employer has planned to terminate an employer before a charge with the administrative agency is filed, the fact that the employer subsequently did terminate the employee "is no evidence whatever of causality." *Smith v. Xerox Corp.*, 371 Fed. Appx. at 519, *citing Clark County School District v. Breeden*, 532 U.S. 268, 272 (2001)(holding that because the supervisor was contemplating transfer of the plaintiff before the supervisor learned of the plaintiff's Title VII suit, the supervisor was not required to suspend the previously planned transfer proceedings merely because the employee filed the suit).  The employer "need not have ceased its disciplinary procedures upon learning of [the plaintiff's] EEOC complaint."  *Id.*

Radio One demonstrated that Scudiero had a history of repeated poor work performance and resultant disciplinary procedures prior to Scudiero's filing his charge with the Texas

Workforce Commission/EEOC on June 15, 2009, the very date that Abernathy recommended that Scudiero be terminated.  #35-25, Ex. Y.  Plaintiffs have not provided any evidence showing that Radio One managers knew about the agency charge up to or on the date it was filed nor shown when Radio One became aware of the charge. Indeed Plaintiffs did not file their discrimination lawsuit until April 11, 2012.

In contrast Radio One provided substantial evidence of multiple reasons that Scudiero was fired that were not retaliatory.  Plaintiffs have failed to show that but for the alleged, but significantly unproven, "retaliation" charge, he would not have been discharged.

As noted, the Supreme Court has held that evidence of Title VII retaliation claims must satisfy but-for causation, i.e., that the retaliation would not have occurred in the absence of the alleged wrongful action of the employer. *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013).  Like the court in *Smith v. Xerox Corp.*, 602 Fed. Appx. at 336, this Court concludes that the evidence does not allow a finding that retaliation was the "but for" cause of Scudiero's discharge, and therefore the punitive damages award to him cannot stand.

### V.  Scudiero's Motion for an Award of Front Pay (#116)

Even if Scudiero had prevailed on his retaliation claim with the award of punitive damages, Scudiero fails to prove that he would be entitled to front pay.

### A. Applicable Law

`     When a plaintiff prevails on a retaliation claim, Title VII, 42 U.S.C. § 2000e-5(g)(1), provides,

> If the court finds that  the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees with or without back pay (payable by the employer, employment agency, or labor

organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

Front pay is an equitable, prospective remedy available under the statute as a remedy for "damage that the plaintiff will continue to suffer after the date of final judgment as a result of the [defendant's] wrongdoing." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490-91 (5th Cir. 2007).

Title 42 U.S.C. § 1981 also permits an employee to recover if his firing was in retaliation for his speech complaining of racial discrimination in employment. *Pinkard v. Pullman-Standard, a Div. of Pullman, Inc.*, 678 F.2d 1211, 1229 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (193); *Foley v. Univ. of Houston Sys.*, 335 F.3d 222, 229 (5th Cir. 2003).  An award of front pay is possible for a plaintiff prevailing under § 1981.  42 U.S.C. § 1981a(b)(4) ("Nothing in this section shall be construed to limit the scope of, or relief available under, section 1981 of ths title.").  *See also, e.g., Swanson v. City of Bruce, Miss.*, No. 3:00CV194-D-A,  2006 WL 717489, at *7 (N.D. Miss. Mar. 16, 2006); *McKnight v. Gen. Motors Corp*, 973 F.2d 1366., 1369-70 (7th Cir. 1992); *DuBose v. Boeing Co.*, 905 F. Supp. 953, 958 (D. Kan. 1995)(but awarding front pay only under § 1981 because § 1981a(a)(1) appears to restrict recovery for future lost income and other compensatory damages to the claim under § 1981 when that claims is brought along with a Title VII claim).

"Since front pay is an equitable remedy, the district court rather than the jury should determine whether an award of front pay is appropriate, and if so, the amount of the award." *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 127 (5th Cir. 1992).  Because reinstatement is preferred, back pay should be awarded only if reinstatement is no longer feasible.  *Id.*  The plaintiff bears the burden to show that reinstatement in not feasible.  *Hansard v. Pepsi-Cola*

*Metropolitan Bottling Co.*, 865 F.2d 1461, 1469 (5th Cir.), *cert denied*, 493 U.S. 842 (1989). In deciding if reinstatement is not feasible, the court should consider "whether positions now exist comparable to the plaintiff's former position and whether reinstatement would require an employer to displace an existing employee," and "whether animosity exists between plaintiff and his former employer." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 (5th Cir. 2007), *citing Julian v. City of Houston*, 314 F.3d 721, 729 (5th Cir. 2002). *See also Green v. Tulane*, 284 F.3d 642, 658 (5th Cir. 2002)(awarding plaintiff front pay after determining reinstatement was not feasible because of "the discord between the parties"), *overruled on other grounds, Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 66 (2006). The court should articulate its reasons for finding reinstatement to be infeasible in such a case. *Palasota*, 499 F.3d at 489. It should also determine whether front pay is reasonable under the facts of the case, and, because it is an equitable remedy intended to make up for future lost earnings, the award should take into account earnings in mitigation of damages. *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007); *Walther*, 952 F.2d at 127. Front pay is appropriate only where to make the plaintiff whole it "is intended to compensate the plaintiff for lost future wages and benefits." *Mota v. Univ. of Texas Houston Health Sci. Center*, 261 F.3d 512, 526 (5th Cir. 2001). A discharged employee's decision to become self-employed, by itself, does not evidence a lack of reasonable diligence. *Hansard*, 865 F.2d at 1468.

Because an award of front pay is necessarily speculative, i.e., "intelligent guesswork," the court is granted wide latitude in reaching its decision. *Downey*, 310 F.3d at 544 (5th Cir. 2007); *Julian v. City of Houston*, 314 F.3d 721, 729 (5th Cir. 2002). The fact that a plaintiff's employment is at-will is not a sufficient basis to deny a motion for front pay. *Julian*, 314 F.3d at 739.

In deciding the amount of a front pay award the court should consider such factors as, *inter alia*, "the length of prior employment, the permanency of the position held, the nature of work, the age and physical condition of the employee, etc., and "whether any front pay award is equitably required and, if so, for what period of time such pay should be granted." *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.3d 869, 871 (5th Cir. 1991).  The court should not award front pay unless it is necessary to make the plaintiff whole and it is to compensate the plaintiff for lost future wages and benefits.  *Mota v. University of Texas Hous. Health Sci. Ctr.*, 261 F.3d 512, 526 (5th Cir. 2001).  Front pay awards "must be carefully crafted to avoid a windfall to the plaintiff since front pay is not supposed to be punitive.  *Palasota*, 499 F.3d at 490.

Regarding a successful Title VII claimant's duty to mitigate damages, the Fifth Circuit summed up in *Patterson v. P.H.P. Healthcare* Corp., 90 F.3d 927, 935-37 (5th Cir. 1996), *cert. denied*, 519 U.S. 1091 (1997), *overruled on other grounds*, *Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 222 (5th Cir. 1999)(*en banc*)(*per curiam*),

> [T]he Supreme Court has recognized that the duty to mitigate damages, "rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n.15 . . . (1982) . . . .  Because an award of back pay is an equitable remedy designed to make the injured party whole, we are persuaded that an injured party has a duty under both § 1981 and Title VII to use reasonable diligence to attain substantially similar employment and, thereby, mitigate damages.  *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459 . . . (1975)(recognizing that "'the remedies available to the individual under Title VII are coextensive with the indiv[i]dual's [*sic*] right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive.'")(quoting H.R. Rep. No. 92-238, at 19 (1971)).  As such, we adopt the statutory requirement to exercise reasonable diligence to attain similar employment as a prerequisite to obtaining back pay under § 1981. . . .
>
> The Supreme Court requires successful Title VII claimants to use "reasonable diligence" to obtain "substantially equivalent" employment.  *Ford Motor Co.*, 458 U.S. at 232 . . . .  The claimant must exercise reasonable diligence in both seeking and maintaining substantially equivalent employment in order to effectuate the reasonable diligence requirement.  *See Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1277 (4th Cir. 1985)(holding that forcing the Title VII

defendants to pay for the claimant's misconduct in her subsequent employment is not properly related to the objective of the back pay requirements).  Substantially equivalent employment has been defined as "'employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has be discriminatorily terminated.'"  [*Sellers v. Delgado College ("Sellers III")*, 902 F.2d 1189, 1193 (5th Cir. 1990)](quoting *Sellers v. Delgado College ("Sellers II")*, 839 F.2d 1132, 1138 (5th Cir. 1989)).

The Fourth Circuit explained that a Title VII claimant has a duty to exercise reasonable diligence to maintain subsequent employment when that employment is substantially similar to the claimant's prior position.  *Brady*, 753 F.2d 1277.  This duty includes an obligation "to make reasonable and good faith efforts to maintain that job once accepted."  *Id.*  We find this reasoning persuasive.  By adopting the requirement to use "reasonable and good faith" effort to maintain employment, reasonable diligence becomes a two part test.  First the claimant must exercise reasonable diligence in obtaining substantially similar employment.  *Ford Motor Co.*, 458 U.S. at 232 . . . ; *and see Sellers III*, 902 F.2d at 1193.  Second, in order to give effect to the statutory requirement to use reasonable diligence, it necessarily follows that the claimant must also use reasonable diligence in maintaining that substantially similar employment.  *Brady*, 753 F.2d at 1277.

"Substantially equivalent" employment is one which "affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the . . . claimant has been discriminatorily terminated."  *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 393 (5th Cir. 2003).

Because reinstatement is usually preferred over an award of front pay, the district court must explain its reasons for finding reinstatement not to be feasible and awarding front pay instead of reinstatement.  *Giles v. General Elec. Co.*, 245 F.3d 474, 489 & n.27 (5th Cir. 2001).  "Calculations of front pay cannot be totally accurate because they are prospective and necessarily speculative in nature."  *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991).  An award of front pay should be reduced by potential future earnings.  *Id.* at 489).  Furthermore the court "must consider [a plaintiff's] failure to mitigate . . . damages in determining the extent to which, if at all, front pay is appropriate."  *Id.*; *Giles*, 245 F.3d at 489

(as with back pay, an award of front pay must take into account a plaintiff's failure to mitigate damages); *Jackson v. Host Intern., Inc.*, 426 Fed. Appx. 215. 223 (5th Cir. Feb. 1, 2011).

The defendant bears the burden of proof on the affirmative defense of failure to mitigate, including the burden to establish the amount that the front pay award should be tolled or reduced. *Jackson*, 426 Fed. Appx. at 225. *citing  Skalka v. Fernald Envtl. Restoration Mgmt Corp.*, 178 F.3d 414, 426 (6th Cir. 19991), and *Giles*, 245 F.3d at 389-90.

## B.  Scudiero's Argument

Scudiero claims that it is not feasible for him to return to Radio One because of the antagonism between the parties, and because five years have passed and he no longer has any contacts in the industry advertising market and is no longer familiar with that market, and he is now in the real estate business.  Therefore Scudiero requests front pay for a three-year period, at which point he expects that his earnings in his real estate business will be comparable to his anticipated earnings at Radio One.   Scudiero testified at trial that he earned $15,718.83 per month in his last six months of employment in 2009 at Radio One, for a total of $94,313.00.  He further testified that he earned $5,180 per month, or $62,160.00 in 2014.   He calculates his economic losses, caused by his retaliatory discharge, to be $10,500 per month, including his mitigating earnings.  Therefore he seeks a total of front pay of $378,000.00 for the three-year period, or alternatively an amount deemed appropriate by the Court.

## C.  Radio One's Response in Opposition (#118)

Radio One provides numerous reasons why the Court should deny Scudiero's motion for front pay.

Radio One first argues that because the verdict does not specify whether the jury found Scudiero's discharge, or his lost commissions, or both, retaliatory, and because the retaliatory

discharge is the only theory that could support his claim for front pay, the Court should deny his

motion. "When the basis of a jury's verdict is unclear," because several issues were litigated and

"the jury may have supported its verdict by finding in the plaintiff's favor on any one of the

issues," the district court may properly deny a front pay award when that award would only be

supportable by one of the issues. *Miles v. Indiana*, 387 F.3d 591, 600-01 (7th Cir. 2004).[8]

In addition, Scudiero has been awarded $185,000.00 in punitive damages. Radio One

argues that the Fifth Circuit has held that it is inappropriate to award both punitive damages and

front pay, and it has also affirmed the offset of punitive damage awards against front pay, even

when the offset resulted in $0 in front pay. *See Hadley v. VAM P T S*, 44 F.3d 372, 376 (5th Cir.

1995) (adopting position that "a substantial liquidated damages award may indicate that an

additional award of front pay is inappropriate or excessive" and remanding for district court's

---

[8] In *Miles*, because the verdict was ambiguous based on the jury's affirmative response to the question, "whether [plaintiff] had 'proven that his complaints of discrimination were more likely than not, a motivating factor in the decision of the defendant . . . to transfer him . . . *or* fail to promote him?,'" the trial court held a post-trial evidentiary hearing on why the plaintiff had not been promoted. The district court subsequently chose reinstatement and denied front and back pay, rejected plaintiff's request to enjoin future retaliation, and ordered the defendant to restructure his job so that he could exercise supervisory responsibilities as he had before the transfer. On appeal, noting that "when the basis of the jury's verdict is unclear, each of the potential theories supporting the verdict is open to contention 'unless this uncertainty be removed by extrinsic evidence showing the precise point involved and determined," the Seventh Circuit affirmed and opined,

> Because of the phrasing of the special verdict inquiry, the jury verdict can be read in three possible ways. The jury could have found retaliation in the transfer of [plaintiff] to the Records Division, retaliation in failing to promote [plaintiff], or retaliation in both the reassignment and failure to promote. If the jury only found retaliation in the reassignment to a position that lacked any supervisory responsibility then providing equitable relief of supervisory responsibility would make [plaintiff] whole without the need for either a promotion or front pay. By contrast, if the jury found retaliation in the failing to promote . . ., then the provision of supervisory duties alone would not make [plaintiff] whole. The jury found retaliation, but did not reveal the basis for that finding.

387 F.3d at 600, citing *Russell v. Place*, 94 U.S. 606, 609 (1876).

reconsideration of front pay after reversal of the $150,000 punitive damages award for intentional infliction of emotional distress), *citing Walther*, 952 F.2d at 127 ("a substantial liquidated damage award may indicate that an additional award of front pay is inappropriate or excessive" in Title VII punitive damages cases); *Clements v. Barden Mississippi Gaming, LLC*, 373 F. Supp. 2d 653, 669-70 (N.D. Miss. 2014)[9] ("The plaintiff is not entitled to front pay in addition to the punitive damages.").[10]  Thus Radio One argues that an award of front pay here is not appropriate at all, but if the Court decides to make such an award, it should offset Scudiero's request for $378,000 in front pay (if it finds that sum appropriate) by the $185,000 in punitive damages awarded by the jury, leaving $193,000 in damages (i.e, $8,000 more than the punitive damages award).  Furthermore, the Court may consider evidence of Scudiero's failure to mitigate during the back pay period.

Radio One further emphasizes that front pay is not appropriate here because Scudiero failed to mitigate his damages.  In *Hansard v. Pepsi-Cola Metropolitan Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir.), *cert denied*, 493 U.S. 842 (1989), an ADEA case, the Fifth Circuit,

---

[9] The Court cites *Reynolds v. Octel Communications Corp.*, 924 F. Supp. 743, 748 (N.D. Tex. 1995), *citing Walther* and *Hadley* for the proposition  that "[i]n the context of age discrimination and sex discrimination, the Fifth Circuit has found that a substantial award of liquidated damages or punitive damages may signal that an additional award of front pay may be excessive and inappropriate."

[10]  *See also Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1110 (5th Cir. 1995)("We recently reaffirmed the principle that 'a substantial liquidated damage award may indicate that an additional award of front pay is inappropriate or excessive' without adopting a bright line limitation."), *citing Hadley*, 44 F.3d at 376, and *Walther*, 952 F.2d at 127); *Palasota*, 499 F.3d at 491 ("The reasoning behind the principle stated in *Walther* is that the receipt of 'a substantial liquidated damage award further strengthens the court's judgment that [the plaintiff] has already been made whole.' . . . .This court has emphasized that the size of a liquidated damages award is only an indicator of the propriety of front pay, not a bright line.  Furthermore, the line of Seventh Circuit cases on which we have relied in crafting our rule notes 'while previous cases . . . suggest that the presence or absence of a liquidated damages award is material in determining entitlement to front pay, we think it should play only a very small role in that determination.'")(citations omitted).

observing that "other courts have held that a plaintiff's failure to mitigate his damages will usually reduce or perhaps eliminate his entitlement to front pay," held that "if the district court finds on remand that [the plaintiff] cannot be reinstated, the court must consider his failure to mitigate . . . damages in determining the extent to which, if at all, front pay is appropriate." Although the jury found that Scudiero did not fail to mitigate his damages, Radio One argues that a district court is "entitled to make its own factual determination regarding whether [the plaintiff] sufficiently mitigated damages to entitle [him] to prospective relief entirely separate from the jury finding of mitigation related to past damages.  The district court's finding that mitigation was not established for front pay purposes is not inconsistent with the jury finding of mitigation for back pay purposes and does not, therefore, compel [the appellate court] to hold that the district court abused its discretion." *Hooker v. Victoria's Secret Stores, Inc.*, 281 F.3d 1278, No. 01-60016, 2001 WL 1692436, at *7 (5th Cir. Nov. 21, 2001), *citing Giles v. General Elec. Co.*, 245 F.3d 474, 489-90 (5th Cir. 2001)(holding that "the court did not abuse its discretion in granting front pay award where, as the factfinder, the court found a failure to mitigate damages for the purposes of back pay relief and denied back pay damages").  Moreover, the court may consider evidence of a plaintiff's failure to mitigate during the back pay period. *Sellers v. Delgado College*, 902 F.2d 1189, 1195-96 (5th Cir.)(holding that the court's denial of front pay was proper because plaintiff did not exercise reasonable diligence to obtain substantially equivalent employment during the back pay period), *cert. denied*, 498 U.S. 987 (1990); *Hooker*, 2001 WL 1692436, at *7 ("The *Giles* decision recognizes that the employee's duty to mitigate serves different purposes for the separate  determinations of entitlement to back pay relief versus front pay relief.  The *Giles* holding further establishes that a factfinder may properly make differing factual determinations as to whether an employee sufficiently mitigated

her damages for front pay versus back pay purposes based on the same evidence of mitigation."),
*citing Giles*, 245 F.3d at 489-90.  "Although the employer is normally required to prove that substantially equivalent work was available and the   former employee did not exercise reasonable diligence to obtain it, once the 'employer proves that an employee has not made reasonable efforts to obtain work, the employer does not also have to establish the availability of substantially equivalent employment.'"   *West*, 330 F.3d at 393, *quoting Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir. 1990); *in accord, Phillips v. Union Carbide*, Civ. No. 01-0495, 2003 WL 1873086, at *1 (E.D. La. Apr. 9, 2003).  In *West*, the Fifth Circuit found that "[t]he trial evidence . . . permits the only reasonable finding that West made no attempts to find substantially equivalent employment" after it became clear that the defendant would not re-employ him, that he did not look for work with any other drilling company or any supervisory employment with any employment, but instead took in turn two nonsupervisory jobs as a truck driver and roustabout for low wages and did not seek any other employment, so the jury could reasonably have found that he failed to mitigate his damages."  *Id.* at 394, *citing Denesha v. Farmers Ins. Exchange*, 161 F.3d 491, 502 (8th Cir. 1998)(affirming district court's denial of front pay where plaintiff took part-time employment in a toy store and as a substitute teacher, did not apply for a job in the insurance industry until two weeks before the front-pay hearing three years after his dismissal, and made only one application for employment in his area of expertise, because "a plaintiff must make some sustained, minimal attempt to obtain comparable employment."), *cert. denied*, 526 U.S. 1115 (1999).  Similarly in *Hansard,* after his termination in June 1983, the plaintiff "applied for a variety of positions with no success," and in March 1984 "abandoned his job search and began running a booth at flea markets" on weekends, never turned a profit, and stopped looking for work after December 1985."  865 F.2d at 1468.  Once he

found the business unsuccessful, he had a duty to mitigate that required that he resume his search with reasonable diligence for other employment, but he failed to do so. The Fifth Circuit found he failed to use reasonable diligence to mitigate his damages after March 1983 and remanded the case for recalculation of back pay damages. *Id.* It further denied him front pay because he failed to show that reinstatement was not feasible and because the district court found that such an award is usually reduced or eliminated by a failure to mitigate and remanded the suit. *Id.* at 1468-69

Radio One points to Scudiero's trial testimony to argue that he failed to make an honest and reasonably diligent effort to mitigate his damages by pursuing substantially equivalent employment. Scudiero conceded that he did not search for employment for two weeks following his discharge, that from time to time and only up to September 2009 (i.e., about one month) he merely had some lunches with people who knew him in the radio industry, but never submitted an application or resume to anyone in the industry and never besides those lunches searched for positions like the ones as Account Executive at various Radio One stations in Kansas City and Houston. Scudiero also testified that he ceased his job search in September 2009 when he formed Vin-See, LLC. A plaintiff who abandons his search for a comparable job and accepts work in a different field at substantially lower wages has failed to mitigate his damages. *West*, 330 F.3d at 394, *citing Hansard*, 865 F.2d at 1468 ("A plaintiff may not simply abandon his job search and continue to recover back pay."). Scudiero's job as a real estate business owner and manager offered completely different promotion opportunities, job responsibilities, and working conditions. Furthermore he earned substantially less from it than he did as an account executive at Radio One. Yet he claims that his one-month job search, abandoned five years before trial, warrants three years of front pay. The Fifth Circuit law shows it does not.

Another reason why the request for front pay should be denied is that at trial after-acquired evidence established that Scudiero would have been discharged for misconduct, insists Radio One.   Front pay and reinstatement are not appropriate remedies when after-acquired evidence justifies a plaintiff's termination.   *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995)("[N]either reinstatement nor front pay is an appropriate remedy" where after-acquired evidence would have led to an employee's termination); *in accord, Weeks v. Coury*, 951 F. Supp. 1264, 1274-75 (S.D. Tex. 1996)(denying front pay and limiting available remedy to time period before employer discovered plaintiff's misrepresentations on job application); *Wiseman v. New Breed Logistics, Inc.*, __ F. Supp. 3d __, No. 3:13-CV-00184-SA-JMV, 2014 WL 7272646, at *10 (N.D. Miss. Dec. 18, 2014).   The employer must demonstrate that the wrongdoing was of such severity that the employee would have been terminated on those grounds alone had the employer known of it at the time of discharge.   *Weeks*, *id., citing McKennon*, *id.; in accord, Shattuck*, 49 F.3d at 1108-09 (*citing McKennon*).   During trial Radio One introduced uncontroverted evidence (emails and other documents) that Scudiero classified the Premier Plastic Surgery account as a direct account[11] in Radio One's computer system, which allowed him to be paid a higher commission rate on the account, while he simultaneously gave the client contact a discounted rate for advertising.   Radio One's former Vice President of Finance, Deborah Cowan, gave undisputed testimony that she would have discharged Scudiero for that wrongdoing had he been a Radio One employee when she discovered it.   Thus this evidence bars an award of front pay to Scudiero.

---

[11]  A direct account is advertising bought directly by a particular business client or advertiser, while an agency account is one purchased by a third party advertising agency on behalf of a business or advertiser.  Radio One wanted its Account Executives to have diversified accounts and Clary repeatedly criticized Scudiero and others for not having sufficient diversity in his accounts.  #35-1, Ex. A, Scudiero Dep. at pp. 119-20.

**D. Scudiero's Reply (#121)**

Scudiero contends that in *Miles*, 387 F.3d at 600, the Fifth Circuit held that when the basis of the jury's verdict is unclear, the district court is free to decide the basis for the jury's verdict unless extrinsic evidence clearly resolves the issue.   He argues that there is ample evidence to support the conclusion that Scudiero was fired because of his complaints of discrimination.   Specifically the majority of the evidence showed that (1) Scudiero's discharge occurred before he completed his Performance Improvement Plan ("PIP"); (2) Radio One was interviewing his replacement while he was still on the PIP; and (3) Scudiero was terminated shortly after he filed a charge of discrimination with the EEOC.

An award of punitive damages is only an indicator of the propriety of front pay, not a bright line rule precluding front pay.  *Palasota*, 499 F.3d at 491, *citing Shattuck*, 49 F.3d at 1110. The presence or absence of a liquidated damages award should play "only a very small role" in the determination of entitlement to front pay.  *Id.*   The primary focus is whether an award of front pay is necessary to make the plaintiff whole, which Scudiero maintains he addressed in his motion.

Scudiero insists that the evidence shows that he mitigated his damages.   He was unable to find employment in the radio industry after his discharge, so he turned to his property management business in order to earn a living.   "'Self-employment may be a reasonable alternative to seeking other employment for purposes of mitigation.'"  *Jackson*, 426 Fed. Appx. at 222, *quoting Hill v. City of Pontotoc, Mis.*, 993 F.2d 422, 427 (5th Cir. 1993).

Furthermore, urges Scudiero, Radio One waived its affirmative defense of after-acquired evidence when it failed to file a responsive pleading to this lawsuit until one day before the scheduled docket call because this Court granted Plaintiff's motion to strike this untimely

defense and excluded Radio One's requested instruction on it from the jury charge.  The jury apparently did not believe Ms. Cowan's testimony about her investigation of the Premier Plastic Surgery Account.

Thus Scudiero asks the court to award him the front pay in the amount of $378,000.00, or such other relief as to which he may be entitled.

**Court's Decision**

The Court finds that reinstatement would not be feasible here because of the hostility between the parties.  Nevertheless, the Court agrees with Radio One for the reasons it cited that Scudiero failed to mitigate his damages and that failure bars his recovery of front pay.  He did not use reasonable diligence to obtain substantially equivalent employment, making minimal effort initially and dropping his efforts to seek substantially equivalent employment in a month.  Moreover, the jury's denial of compensatory damages indicates that it found he was not monetarily damaged by his discharge.   Furthermore, the Court agrees that after-acquired evidence of his manipulation of the Premier Plastic Surgery account to obtain a higher commission rate, on top of his cumulative record of past performance deficiencies, would have resulted in his discharge.  Thus the Court denies his motion for front pay.

**V.  Plaintiffs' Motion for Entry of Judgment and Application For Attorneys' Fees (#117)**

Because Scudiero did not prevail on his racial discrimination claim and because the Court has concluded that Plaintiffs cannot prevail on their retaliation claim because they failed to show that Radio One acted with malice or with reckless indifference to Plaintiffs' federal protected rights as the but-for cause of the discharges, the Court does not reach this motion nor the consequences of Radio One's notice of unaccepted offer of judgment under Federal Rule of Civil Procedure 68 (#120).

## VI.  Order

Accordingly, for the reasons stated above, the Court

ORDERS the following:

1.  Plaintiffs motion to strike untimely affirmative defenses (#71) is MOOT;

2. Plaintiffs' motion for new trial (#110) is DENIED;

3. Radio One's motion for entry of take nothing judgment (#113) is GRANTED;

4. Scudiero's motion for an award of front pay (#116) is DENIED;

5. Plaintiffs' motion for entry of judgment and application for attorneys' fees (#117) and the consequences of Radio One's notice of unaccepted offer of judgment under Federal Rule of Civil Procedure 68 (#120) are MOOT.

A final judgment will issue by separate order.

SIGNED at Houston, Texas, this 30th day of September, 2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE